IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOHNSON REGIONAL MEDICAL CENTER                                                           PLAINTIFF

v.                                            Case No. 2:14-CV-02174

DR. ROBERT HALTERMAN                                                                       DEFENDANT

**OPINION AND ORDER**

Currently before the Court are cross motions for summary judgment as to Count 1 (Docs. 12 and 16), and Defendant's motion for summary judgment as to Count 2 (Doc. 12). Also before the Court are the parties' responsive filings, and various exhibits in support. Having reviewed the filings, the Court finds that Plaintiff's motion for summary judgment as to Count 1 should be granted, and Defendant's motion for summary judgment as to both counts should be denied.

**I.    Legal Standards**

In determining whether summary judgment is appropriate, the burden is on the moving party to establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties file cross-motions for summary judgment on an issue. Each motion should be reviewed in its own right, with each side, respectively, "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998). In order for there to be a genuine issue of material fact, the evidence must be "such that a reasonable jury could return

-1-

a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**II.    Background**

Plaintiff Johnson Regional Medical Center ("JRMC") filed suit against Defendant Dr. Robert Halterman in Johnson County Circuit Court on June 17, 2014. JRMC removed the case to this Court on August 13, 2014. JRMC brings two claims for breach of contract against Halterman. In Count 1 of the complaint, JRMC alleges that Halterman breached a recruitment agreement ("the Recruitment Agreement") and seeks damages for Halterman's failure to pay the balance on an attached promissory note ("the Note") to JRMC. In Count 2, JRMC alleges that Halterman breached an employment agreement ("the Employment Agreement").

Dr. Robert Halterman received a degree in Doctor of Osteopathy in 1988. Halterman subsequently focused his practice in obstetrics and gynecology ("OB/GYN"). In early 2013, JRMC sought to recruit Halterman to work in its facilities as a full time OB/GYN practitioner. On March 20, 2013, Halterman executed a promissory note in favor of JRMC, in which he agreed to make monthly payments to JRMC in exchange for JRMC's issuance of a loan to him in the original principal sum of $50,000. (Doc. 16-1). In conjunction with the promissory note, Halterman also executed the Recruitment Agreement, which provided in part that JRMC would forgive Halterman's payments on the promissory note as they came due provided certain conditions were met. (Doc. 16-2). On the same day, Halterman also executed the Employment Agreement, setting out the terms of Halterman's employment with JRMC.

Halterman subsequently began working for JRMC full-time in July 2013. It is undisputed that just four months later, on November 6, 2013, Halterman accidentally slipped on some liquid in

the stairwell next to his office at JRMC's facilities.  It is also undisputed that Halterman injured his shoulder as a result of the slip and fall and that he was not immediately able to perform certain medical procedures.  However, the extent to which the shoulder injury prevented Halterman from returning to work at JRMC and from fulfilling any employment obligations is in dispute.  Halterman states that he resigned from JRMC due to the fact that his shoulder injury made him "unable to perform many of the types of medicine he had been hired to do by [JRMC]."  (Doc. 13, ¶ 6, 9).  JRMC disputes that Halterman's injury made it impossible or impracticable for him to return to work for JRMC and disputes that Halterman's injury was ultimately the reason for his resignation. (Doc. 20, ¶ 6, 9).

Halterman resigned his employment with JRMC effective December 23, 2013, by letter sent to JRMC Administrator Larry Morse.  (Doc. 16-4).  On January 17, 2014, JRMC sent Halterman a letter informing Halterman that it had exercised its option to terminate the Recruitment Agreement, stating "[p]ursuant to Sections 5.1(b)(i) and 1.1 of the Recruitment Agreement, this Letter serves as written notice to you that the Recruitment Agreement is terminated, effective as of December 23, 2013."  (Doc. 16-5, p. 1).  The letter further informed Halterman that, due to the termination, JRMC's monthly forgiveness of payments due on the Note would cease, and JRMC demanded payment of the remaining balance of $37,894.00 by February 28, 2014.  *Id*.  Halterman has since failed to make any payment on the Note to JRMC.

  **A.**  **Count 1: Breach of Recruitment Agreement/Promissory Note**

As to Count 1, JRMC alleges that Halterman breached his obligation to repay $50,000 advanced to him by JRMC pursuant to the Note executed in conjuction with the Recruitment Agreement. JRMC argues that the promissory note is a stand-alone agreement requiring Halterman

to make monthly payments to JRMC over a twenty-four month period beginning on or about July 1, 2013.  Halterman argues that the promissory note cannot be viewed in isolation and, instead, must be considered together with both the Recruitment Agreement and the Employment Agreement and that, if his performance of his obligations under one Agreement is excused, so too should his obligation to repay the amount owed under the Note be excused.  This dispute as to how the Agreements should be construed is a purely legal dispute that may be resolved by the Court as a threshold matter.  By virtue of the fact that this is a diversity action and by virtue of the fact that the Agreements at issue have choice-of-law provisions stating that Arkansas law will apply to any disputes (Doc. 12-3, ¶ 15; Doc. 12-4, § 5.3), the Court will apply Arkansas law to the substantive issues in this action.

      Halterman cites to Arkansas Model Jury Instruction 2420 for the proposition that "[i]f the parties' contract is contained in more than one document, all of the documents must be considered together."  The commentary to that instructions cites *Stokes v. Roberts*, 289 Ark. 319 (1986).  In *Stokes*, the Supreme Court of Arkansas set forth the standard for when separate contractual documents should be considered together:

> When two instruments are executed contemporaneously, by the same parties in the course of the same transaction, they should be considered as one contract for purposes of interpretation, in the absence of a contrary intention.  To arrive at the intention of the parties to a contract, courts may acquaint themselves with the persons and circumstances and place themselves in the same situation as the parties who made the contract.  We may also consider the construction the parties themselves place on the contract.

289 Ark. at 322-23.  Here, while the Employment and Recruitment Agreements were executed contemporaneously by the same parties, it is clear from their terms that they are separate agreements intended to be construed separately.  Looking to the agreements themselves, both contain

independent merger clauses (Doc. 12-3, ¶ 23; Doc. 12-4, § 5.14). The merger clause in the Employment Agreement states unambiguously that "[t]his Agreement . . . contains the entire agreement between the parties concerning the subject matter hereof . . ." (Doc. 12-3, ¶ 23). The Recruitment Agreement likewise states that "[t]his Agreements and all Exhibits hereto as well as the agreements and other documents referred to in this Agreement constitute the entire agreement between the parties with regard to the subject matter hereof and thereof." (Doc. 12-4, § 5.14). The Court has not found any reference to the Employment Agreement in the Recruitment Agreement, and a section in the Recruitment Agreement with the heading "PRACTICE OBLIGATIONS" was purposefully omitted. *Id*. at p. 2. The Employment Agreement sets forth the terms of Halterman's employment with JRMC—Halterman's duties and responsibilities, insurance requirements, billing arrangements, non-compete and non-solicitation prohibitions, etc. The Recruitment Agreement specifically addresses the $50,000 advance paid to Halterman and the terms of repayment and loan forgiveness. Each Agreement has differing obligations for each party as well as different occurrences that might trigger termination of the Agreement, indicating that the Agreements were separately negotiated and intended to set forth independent contractual obligations. Furthermore, each Agreement contains independent sections addressing choice of law (Doc. 12-3, ¶ 15; Doc. 12-4, § 5.3), assignment (*id*. at ¶ 16 and § 5.5), severability (*id*. at ¶ 12 and § 5.6), notices (*id*. at ¶ 21 and § 5.4), waiver (*id*. at ¶ 22 and § 5.8), and general interpretation and ambiguities (*id*. at § 25 and § 5.21). It is not likely that parties who included differing substantive obligations and what would be duplicative (and, in the case of certain provisions, conflicting) boilerplate provisions in two separate contracts would have actually intended that the two contracts be construed together as one. The Court finds therefore that the Recruitment Agreement and Employment Agreement should be treated

as separate contracts.  The Court will proceed, then, with analysis of JRMC's claim as to the Recruitment Agreement and attached Note.

The Recruitment Agreement provides that, as Halterman's monthly payments of the Note became due, "provided that [Halterman] remains in full compliance with all his obligations hereunder, [JRMC] shall forgive the payment of principal and interest on [the Note] due on that date." (Doc. 16-2, § 4.2).  The Recruitment Agreement further provides that "[f]orgiveness of the [promissory note] shall cease upon the occurrence of any event" of termination described in the agreement and that "all amounts due under the Note at such time shall be immediately due and payable to [JRMC] . . ." *Id*. at § 4.3.  This is again reiterated later in the Recruitment Agreement with the statement that "[u]pon termination of this Agreement, [JRMC's] obligations hereunder shall cease, and all amounts advanced by [JRMC] pursuant to this Agreement, plus accrued interest, less amounts repaid by [Halterman] to [JRMC] or forgiven pursuant to this Agreement, shall become an obligation of [Halterman] to [JRMC] immediately due and payable." *Id*. at § 5.1(d).

Halterman argues that JRMC's obligation to forgive his loan repayments was "*tied directly* to [Halterman's] ability to perform" under the Recruitment and Employment Agreements taken together. (Doc. 14, p. 6).  Halterman reasons that if his performance of the Employment Agreement is excused, so is repayment of the $50,000 advance.  This does not follow.  First, the Court has already found that the Recruitment and Employment Agreements are separate Agreements to be considered independently.  Second, Halterman conflates JRMC's obligation to forgive his loan payments with his own obligation to make the payments in the first place.  The Recruitment Agreement contemplates that JRMC will confer a benefit on Halterman in the form of loan forgiveness, if Halterman remains "in full compliance with all his obligations hereunder." (Doc. 16-

2, § 4.2). Halterman's obligation to repay the $50,000 advance is separate and apart from any obligation of JRMC to forgive those payments. Therefore, even if Halterman's non-performance of his obligations under the Employment Agreement or the Recruitment Agreement (or both taken together) were found to be excused, it does not follow that JRMC would have a continuing obligation to forgive Halterman's loan repayments. Third, Halterman's failure to render performances—whether justified or not—would still operate to relieve JRMC of its own obligations under the agreements. Restatement (Second) of Contracts § 267, 237. Therefore, Halterman's failure to fulfill his employment obligations and failure to maintain a full-time practice relieved JRMC of its obligation to forgive Halterman's loan repayments. Halterman's obligation to repay the loan pursuant to the Note, however, continued. Finally, if Halterman intends to argue that JRMC somehow has a continuing obligation to forgive his loan repayments, this argument would give rise to an affirmative claim for breach of contract; it does not give rise to an affirmative defense for his own failure to repay the loan as required by the Note.

Pursuant to the Recruitment Agreement, JRMC could exercise an option to terminate the Agreement upon "(i) breach by [Halterman] of any term, convenant or condition hereof; [or] (ii) death or permanent disability preventing [Halterman's] performance of his/her obligations hereunder." (Doc. 16-2, § 5.1(b)). The first paragraph under Article I "Physician's Obligations" is headed "Full-time Practice" and states that "[Halterman] agrees to practice Obstetrics and Gynecology . . . on a full-time basis . . . . [Halterman] shall, in good faith and with diligence, pursue his/her practice on a full-time basis and shall maintain regular office and practice hours." *Id*. at § 1.1. The Recruitment Agreement also specifically contemplates that "[Halterman intends to engage in the full-time practice of medicine in the Service Area, and has agreed to repay all obligations with

respect to amounts advanced pursuant to the terms of this Agreement." *Id*. at p. 1. Upon Halterman's decision to resign, and therefore discontinue full-time or any other practice with JRMC, JRMC had the option to terminate the Recruitment Agreement. This is true no matter the reason for Halterman's resignation. If the resignation was entirely voluntary, Halterman was in breach of his obligation to continue full-time practice with JRMC. If the resignation was out of necessity due to Halterman's shoulder injury, the fact remains that Halterman was not continuing a full-time practice with JRMC, even though he might have had a "permanent disability" preventing his performance of his obligations. In either event, JRMC had the contractual right to terminate the Recruitment Agreement and demand payment on the Note.

Halterman also argues that he used the $50,000 advance for relocation expenses in moving to Clarksville, Arkansas. This is immaterial. Presumably the recipient of an advance or loan will use the funds so advanced for some immediate purpose. Otherwise, there would be no need for an advance or loan in the first place. The fact that loan funds are used, as expected, certainly does not excuse later repayment. The purpose for which Halterman used the funds loaned to him is not at issue in this case. By the clear terms of the promissory note, the $50,000 received by Halterman was to be repaid in "[e]qual monthly installments of principal and interest . . . continuing over a 24-month term until all amounts due hereunder by [Halterman] have been paid to [JRMC]." (Doc. 12-5, p. 2). The promissory note acknowledged that the "principal and interest due . . .may be forgiven" as set forth in the Recruitment Agreement. *Id*. The $50,000 was clearly a loan to be repaid—not a relocation bonus or some sort of incentive payment. The Court notes that the Employment Agreement separately provided for Halterman to receive a stipend "in addition to [his] compensation" for "moving expenses" of up to $15,000. This payment of relocation expenses was

to be repaid only if Halterman did not ultimately commence employment with JRMC. The two provisions in the two separate agreements stand in stark contrast.

It is undisputed that JRMC loaned Halterman $50,000, that he was obligated to repay that sum absent loan forgiveness by JRMC, and that he has failed to make any payments since JRMC notified him that it was terminating the Recruitment Agreement. While the parties dispute whether Halterman's repayment obligation should be excused, this dispute is one that can be decided as a matter of law. For the reasons set forth above, the Court finds that Halterman and JRMC entered into two separate agreeements—the Recruitment Agreement and the Employment Agreement, which can and should be construed independently of one another. In conjunction with the Recruitment Agreement, Halterman executed a promissory note independently obligating him to repay JRMC the $50,000 pursuant to the terms of the Note.

Halterman has not set forth any facts that would give rise to a genuine issue of any material fact as to any affirmative defense that would excuse his obligation to repay what is owed on the Note. Halterman has not set forth any facts alleging that he agreed to repayment of the $50,000 advance based on fraud in the inducement or that JRMC acted in bad faith in negotiation of the Note. Halterman has likewise failed to show that it was or is impossible or impracticable for him to repay the advance, as he gained alternate employment months after his resignation from JRMC and remains employed to the present time. JRMC has established an absence of a genuine issue as to any fact material to resolution of Count 1, and the Court therefore finds that summary judgment should be entered in favor of JRMC on Count 1.

  **B. Count 2: Breach of Employment Agreement**

Halterman moves for summary judgment as to Count 2 based on the affirmative defense of

impossibility or impracticability of performance. Halterman argues that his shoulder injury prevented him from performing many of the types of medicine he had been hired by JRMC to do. He represents that he did not expect to be able to return to full-time practice for at least six months and might possibly never be able to return to practice full time. Halterman states that his injury and resultant inability to return to work caused him to submit his letter of resignation to JRMC. JRMC disputes that Halterman's shoulder injury was the motivating reason for his resignation and disputes that it was impossible or impracticable for Halterman to perform his obligations under the Employment Agreement.

The Arkansas Supreme Court recently re-affirmed the standard for establishing an impossibility defense:

> The burden of proving impossibility of performance, its nature and extent and causative effect rests upon the party alleging it. He must show that he took virtually every action within his power to perform his duty under the contract. It must be shown that the thing to be done cannot be effected by any means. Resolution of the question requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of fault on his part in failing [to] perform.

*Ark. Realtors Ass'n v. Real Forms, LLC*, 2014 Ark. 385, 13 (2014) (finding appellant was not entitled to jury instruction on impossibility defense where "evidence suggests that Appellant failed to take 'every action within its power to perform its duty under the contract'") (quoting *Frigillana v. Frigillana*, 266 Ark. 296, 302-03 (1979)). Arkansas Model Jury Instruction 2439, addressing the defense of impossibility of performance, instructs that the party asserting the defense "has the burden of proving each of two essential propositions: First, that [the party] diligently attempted to perform the contract; and Second, that performance became impossible as a result of" some "legally recognized event on which [the party] relies."

While it does not appear that the law on this issue has significantly evolved in Arkansas jurisprudence, the Court recognizes that the doctrine of impossibility has generally evolved into one of impracticability as opposed to strict, objective impossibility. *See* Restatement (Second) of Contracts § 261 (1981) ("Where, after a contract is made, a party's performance is made *impracticable* without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."). Nonetheless, "a party is expected to use reasonable efforts to surmount obstacles to performance, and a performance is impracticable only if it is so in spite of such efforts." *Id*. at § 261, comment (d). The Court also recognizes the principle that "[i]f the existence of a particular person is necessary for the performance of a duty, his death or such incapacity as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made." *Id*. at § 262. Whether or not an injury results in incapacity to a degree rendering performance of a contractual obligation impracticable will, of course, depend on the facts and circumstances of each particular case. Finally, "[w]here only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if (a) it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render . . ." *Id*. at § 270.

Halterman avers, and JRMC does not dispute, that Halterman was unable to perform many of the types of procedures he was hired to perform immediately after his injury. JRMC did not, however, pressure Halterman to resign or to even make any decisions about returning to full-time employment. (Doc. 16-6, ¶ 13; Doc. 21-3, p. 11). In his deposition, Halterman acknowledged that he did not attend all recommended sessions of physical therapy to work towards recuperating his

shoulder. (Doc. 21-3, p. 4). Halterman stated that he chose not to pursue surgery on his shoulder and that he did not discuss any options for continuing to work with JRMC, such as bringing in another physician to fill in on procedures Halterman could not perform. *Id*. at pp. 8-9. Halterman stated "I don't think, after the injury, there was much conversation about building a practice or what the future would hold. It was just kind of, okay, you're on your own. We're on our own. Let's just see what happens." *Id*. at p. 9. While Halterman may have tried to arrange a meeting with Larry Morse, ultimately Halterman did not have an in-person meeting with the Administrator about what could be done to keep Halterman at JRMC. *Id*. Halterman did inquire about the possibility of a leave of absence with Morse, but did not receive a definitive response before submitting his letter of resignation and did not take up the issue with the human resources department. *Id*. at p. 10. Subsequent to his resignation with JRMC, Halterman resumed working as a hospitalist just months later in the spring of 2014. *Id*. at p. 14. Based on this record, Halterman has failed to show an absence of a genuine issue as to the material fact of whether he made an appropriate effort to continue to fulfill his employment obligations to JRMC in the face of his injury, such that performance of those obligations could be said to have been impossible or impracticable. Even assuming that Halterman's performance of his employment obligations was partially impracticable, there remain issues of fact as to whether Halterman was unable to render performance that was substantial and in keeping with his obligations to JRMC.

      Furthermore, while Halterman's letter of resignation cited his shoulder injury as the reason for his resignation, (Doc. 12-5, p. 4), Halterman admitted in his deposition that JRMC was not pressuring him to make a decision about getting back to work and that he sent his letter of resignation "primarily . . . because of the every five days off and five—every fifth weekend [of on-

call duty]. I mean, they were not going to stick to that. That's what I signed on to do, and they weren't going to honor it." (Doc. 21-3, p. 12). Halterman's letter of resignation acknowledges the potential for recovery from his shoulder injury and a return to full-time practice after four to six months if Halterman opted for surgical intervention to treat the injury. (Doc. 12-5, p. 4). The letter also acknowledges that Halterman "was given the option of waiting with physical therapy and other rehabilitation options but quite frankly this may have been my 'wake up call' or if you will my 'swan song' to either semi-retire or find employment on a part time basis . . ." *Id*. The record does not support Halterman's argument that there is an absence of a genuine issue as to the material fact of Halterman's motivation for his resignation—whether his shoulder injury made it impossible for him to continue fulfilling his employment obligations at JRMC.

In regard to whether JRMC might recover on its claim that Halterman breached the Employment Agreement, there remain genuine issues of material fact precluding the entry of summary judgment, including but not limited to: whether Halterman's shoulder injury made it impossible or impracticable for him to comply with his obligations under the Employment Agreement such that his non-performance should be excused, and whether Halterman's shoulder injury was the reason for his resignation. Both of these issues will require a fact-intensive inquiry in this case and are not amenable to resolution by the Court as a matter of law. As to his defenses of fraud and bad faith, Halterman admits that there remain issues of fact in dispute. (Doc. 23, p. 4 ("This evidence creates questions of fact concerning Defendant's defenses of fraud and bad faith.")). Halterman's motion for summary judgment as to Count 2 must therefore be denied.

### III.   Conclusion

For all the reasons set forth above, IT IS ORDERED that Defendant's motion for summary

judgment (Doc. 12) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment as to Count 1 (Doc. 16) is GRANTED.

This case remains set for trial on August 17, 2015 as to Count 2.

The Court will require further briefing on the specific amount of damages to be awarded to JRMC on Count 1, to include the amount currently owed on the promissory note, interest, and any attorneys' fees[1] if appropriate and desired. The Court will, however, delay briefing of this issue until after all issues of liability in this case have been resolved.

IT IS SO ORDERED this 24th day of July, 2015.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE

---

[1] *See* Doc. 12-5, p.1 ("Maker agrees to pay, to the extent permitted by law, all costs and expenses incurred by Holder in connection with the collection and enforcement of this Note, including, but not limited to, expenses and reasonable attorneys' fees to the extent permitted by applicable law . . ."); *Baptist Memorial Hosp.—Forrest City, Inc. v. Neblett*, 2012 Ark. App. 191 (2012) (where physician defendant was found to have breached his obligations under an agreement and promissory note with hospital, by failing to continue to work full time as required such that loan forgiveness by the hospital was not triggered in full, attorneys' fees could be recovered).